**BARNETT BANK OF SOUTH FLOR-IDA, N.A. and Barnett Bank of Palm Beach County, Plaintiffs,**

**v.**

**Robert L. CLARKE, in his official capacity as the Comptroller of the Currency of the United States and Consolidated Bank, N.A., Defendants.**

**No. 88–8225–CIV.**

United States District Court, S.D. Florida.

April 5, 1989.

---

Robert J. Winicki, Jacksonville, Fla., William B. King, West Palm Beach, Fla., for plaintiffs.

Kendall B. Coffey, Miami, Fla., for Consolidated Bank.

Ana T. Barnett, Miami, Fla., Asst. U.S. Atty., for Clarke.

Albert T. Gimbel, Tallahassee, Fla., Brief amicus curiae.

## ORDER

PAINE, District Judge.

This cause comes before the court upon the Motion for Preliminary Injunction (DE 4) of the Plaintiffs, BARNETT BANK OF SOUTH FLORIDA, N.A. and BARNETT BANK OF PALM BEACH COUNTY. Having considered the Motion and the relevant authorities, the court enters the following order.

On May 13, 1988, the Plaintiffs filed a Verified Complaint for Declaratory and Injunctive Relief (DE 1). The Motion for Preliminary Injunction under consideration here was filed simultaneously with the Complaint. An Amended Complaint for Declaratory and Injunctive Relief was filed on May 17, 1988. In addition to the evidence received at the hearing on the preliminary injunction, the court has considered the following in ruling upon this Motion: Plaintiffs' Memorandum of Law in Support of the Motion for Preliminary Injunction (DE 5), the Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction (DE 15) of Defendant, CONSOLIDATED BANK, its Appendix (DE 16), the Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction (DE 17) of Defendant, ROBERT L. CLARKE [hereinafter "COMPTROLLER"], Plaintiff's Re-

ply Memorandum in Support of Motion for Preliminary Injunction (DE 20), Defendant's Supplemental Memorandum (DE 23) and Plaintiffs' Reply thereto (DE 28) and the Brief Amicus Curiae of the State of Florida Ex Rel. Gerald Lewis as Comptroller and Head of the Department of Banking and Finance in Support of Plaintiffs' Amended Complaint for Declaratory and Injunctive Relief (DE 32). The court also reviewed the administrative record filed by Defendant, COMPTROLLER (DE 21).

### Facts

The basic facts as alleged in the Amended Complaint are largely undisputed. Plaintiff, BARNETT BANK OF SOUTH FLORIDA, N.A. and Defendant, CONSOLIDATED BANK, N.A. [hereinafter "CONSOLIDATED"], are national banking associations, both of whom have their principal places of business in Dade County, Florida. BARNETT BANK OF PALM BEACH COUNTY is a state banking corporation organized under the laws of the state of Florida. In December of 1987, CONSOLIDATED applied to the COMPTROLLER for permission to establish a "mini branch" in a grocery store located in West Palm Beach, Florida. Under 12 U.S.C. § 36(c) of the National Bank Act, also known as the McFadden Act, a national bank may establish branches as follows:

> A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches ... at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks....

Therefore, the COMPTROLLER could, if satisfied with other relevant considerations, approve a branch by CONSOLIDATED to the extent that such a branch would be permitted to state banks under the Florida Statutes. The McFadden Act provides that the term "state bank" includes "trust companies, savings banks, or other such institutions carrying on the banking business under the authority of State laws." 12 U.S.C. § 36(h). Pursuant to § 658.26(2)(a) of the Florida Statutes, "with the approval of the department and upon such conditions as the department prescribes, any bank may establish branches within the limits of the county in which the parent bank is located." Under certain conditions, a state bank also "may establish branches by merger with any other bank located in this state." Fla.Stat. § 658.26(2)(a). The COMPTROLLER approved CONSOLIDATED's branch application, relying primarily upon the case of *Department of Banking and Consumer Fin. v. Clarke*, 809 F.2d 266 (5th Cir.1987), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 745 (1987) [hereinafter *"Deposit Guaranty"*]. This case will be discussed at length, below. However, put simply, the court in *Deposit Guaranty* found that the definition of "banking business," and therefore "state bank," for purposes of § 36 of the McFadden Act, may include state savings and loan associations if such institutions are carrying on the functions traditionally handled by state commercial banks. Florida law places no restrictions on the location of branches for state savings and loan associations. Fla.Stat. § 665.028. As the COMPTROLLER found that Florida savings and loan associations were "carrying on the banking business," he in turn found it consistent with the McFadden Act's policy of competitive equality[1] to approve CONSOLIDATED's application to establish a branch outside of its home county. Plaintiffs disagree with the COMPTROLLER's functional approach, arguing that he has erred in his interpretation of the federal law. Therefore, the argument runs,

---

**1.** *See First Nat'l Bank in Plant City v. Dickinson,* 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969); *First Nat'l Bank of Logan v. Walker Bank & Trust Co.,* 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966). For a thorough discussion of the doctrine of competitive equality and the *Deposit Guaranty* decision, see Butler, *The Competitive Equality Doctrine and the Demise of Intrastate Banking Restrictions,* 55 Tenn.L.Rev. 703 (1988).

CONSOLIDATED should be restricted to the same branching criteria as state commercial banks. CONSOLIDATED finds this "an unabashedly hypertechnical argument exalting state statutory form over federal regulatory policy and purpose." (DE 15 at 4). Plaintiffs request that the court issue an injunction barring the COMPTROLLER from granting CONSOLIDATED permission to establish a de novo branch in Palm Beach, County.

### Preliminary Injunction

A preliminary injunction should only be granted if the moving party clearly establishes all of the following factors:

(1) a substantial likelihood of ultimate success on the merits;

(2) a showing that he will suffer irreparable injury unless the injunction issues;

(3) proof that the threatened injury to him outweighs whatever damage the proposed injunction may cause the opposing party; and,

(4) a showing that the injunction, if issued, would not be adverse to the public interest.

*Cunningham v. Adams,* 808 F.2d 815, 819 (11th Cir.1987).

### *Likelihood of Success on the Merits*

#### 1. Review of an Agency Decision

■ Plaintiffs request the court to review the actions of an agency entrusted with the administration of a particular federal statutory scheme. The level of deference afforded the agency's decision depends upon "whether Congress has spoken to precise question at issue." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If the Congressional intent is unambiguous, both the court and the agency must give effect to it as expressed. *Id.* However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782; *Deposit Guaranty,* 809 F.2d at 269. Since one of the roles of an administrative agen-

cy is to formulate policies to fill the gaps left either explicitly or implicitly by Congress when creating the statute, the court will not disturb a reasonable interpretation by such an agency. *Id.,* 467 U.S. at 843–44, 104 S.Ct. at 2782; *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). Congress left such a gap by including the language "carrying on the banking business" in § 36(h) of the McFadden Act.

#### 2. The Doctrine of Competitive Equality

■ The National Bank Act of 1864 was amended in 1927 and thereafter became commonly known as the McFadden Act. *See First Nat'l Bank of Logan v. Walker Bank & Trust Co.,* 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966) [hereinafter *Walker Bank* ]. At that time, the amendment's sponsor, Representative McFadden, first characterized the theme of competitive equality:

As a result of the passage of this act, the national bank act has been so amended that national banks are able to meet the needs of modern industry and commerce and competitive equality has been established among all member banks of the Federal reserve system.

*Id.* at 258, 87 S.Ct. at 496 (quoting 68 Cong.Rec. 5815 (1927)). The congressional goal was to make state and national banks equal and competitive in their ability to participate in branching activities. *Dakota Nat'l Bank & Trust v. First Nat'l Bank,* 554 F.2d 345, 353 (8th Cir.1977). The concept of competitive equality has been reaffirmed frequently by the federal courts. *Id.; First Nat'l Bank in Plant City v. Dickinson,* 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969) [hereinafter *Plant City* ]; *Deposit Guaranty,* 809 F.2d 266 (5th Cir.1987); *Mutschler v. Peoples Nat'l Bank of Wash.,* 607 F.2d 274 (9th Cir.1979); *Texas v. Clarke,* 690 F.Supp. 573 (W.D.Tex. 1988). In his effort to further the policy of competitive equality in this case, the COMPTROLLER determined that federal law controlled his definitions of "state bank" and "banking business." Therefore, as stated by the court in *Deposit Guaranty,* "the threshold issue we confront is

whether the Comptroller, in his interpretation and application of a federal statute, in this case 12 U.S.C. § 36(h), should look to state or federal law to define the statute's terms." *Deposit Guaranty*, 809 F.2d at 269.

In formulating the definition of state bank, the COMPTROLLER looked to "the functions a financial institution performs and the activities it conducts rather than on what the institution is permitted by the state to call itself, or on the title of the state statute under which the institution operates." (DE 21, Administrative Record, Comptroller's Order at 6). To support this approach the COMPTROLLER cites the language of § 36(h) of the McFadden Act itself which states that "[t]he words 'State bank,' 'State banks,' 'bank,' or 'banks,' as used in this section, shall be held to include trust companies, savings banks, or other such institutions carrying on the banking business under the authority of State laws." 12 U.S.C. § 36(h). The COMPTROLLER views the open-ended nature of § 36(h) as an intentional effort by Congress to accommodate changes in banking practices and thereby maintain the policy of competitive equality. (DE 21, Administrative Record, Comptroller's Order at 6). Therefore, the COMPTROLLER defined the terms as a matter of federal law not constrained by the labels placed upon various banking institutions by state law.

On the other hand, Plaintiffs argue that 12 U.S.C. § 36(h), by referring to "institutions carrying on the banking business under the authority of state laws," explicitly adopts the approach of § 36(c), by incorporating state law into the definition of state bank. Plaintiff argues that the Florida Statutes explicitly exclude savings and loan associations from treatment as state banks. Section 658.74(1)(b) of the Florida Statutes provides that "[n]o person other than a

bank shall, in this state, transact business in the way or manner of a bank." Subsection (2)(a) states that "[n]o person other than a bank shall, in this state ... [t]ransact business under any name or title which contains the word 'bank,' 'banker,' 'banking,' or 'trust company,' or words of similar import, in any context or in any manner...." Finally, the Florida Statutes provides that "the term 'bank' does not include an industrial savings bank ..., a credit union, a building and loan association, or a savings and loan association." Fla.Stat. § 658.12(3). Both the state Comptroller in his amicus brief and the Plaintiffs go on to point out the distinctions between the treatment of federal banks and federal savings and loan associations. (DE 32 at 16–7; DE 5 at 21–6). Although the court cannot dispute the distinctions between the two types of federal institutions, they are not relevant to the issue at bar.

In *Plant City*, the Supreme Court found the policy of competitive equality required the application of a federal definition of the term "branch" as used in the McFadden Act. The court stated that "[a]dmittedly, state law comes into play in deciding how, where, and when branch banks may be operated ... But to allow the States to define the content of the term 'branch' would make them the sole judges of their own powers." *Plant City*, 396 U.S. at 133, 90 S.Ct. at 343.[2] The court finds, as did the COMPTROLLER, that this reasoning is equally applicable to the definition of the terms state bank and banking business.

The Court of Appeals for the Fifth Circuit also found *Plant City*'s reasoning enlightening. *See Deposit Guaranty*, 809 F.2d at 269–70. In *Deposit Guaranty* the court was dealing with a statutory scheme in Mississippi virtually identical to that present in Florida. State commercial

---

**2.** Plaintiffs point to language in *Plant City* which they contend supports their argument. (DE 5 at 19). The Supreme Court stated that the Comptroller's approval of a branch application by a national bank was "a systematic attempt to secure for national banks branching privileges which Florida denies to competing state banks." *Plant City*, 396 U.S. at 138, 90 S.Ct. at 345. At the time that the Court rendered its decision the

Florida Statute relevant to branching was significantly different. Section 659.06(1)(a) of the Florida Statutes prohibited all branching by state chartered banks. A bank was permitted to have one place of business and none elsewhere. Accordingly, The Court's language is no longer pertinent to Florida's statutory scheme as it exists today.

banks were permitted to branch within the county in which their principal offices were located. State chartered savings and loan associations were permitted to branch statewide. Additionally, legislation existed which conferred some traditional banking powers upon Mississippi savings institutions. Therefore, the Comptroller approved a branch outside the national bank's home county, applying the same reasoning as he has in this case. The district court concluded that the Comptroller's reasoning with respect to the definition of the term state bank was in error. The fifth circuit reversed. After a discussion of *Walker Bank* and *Plant City*, the appellate court stated the following with regard to the Comptroller's decision:

> The principle of competitive equality guided the Comptroller's analysis and informed his decision in the present case. He observed that "the concept of competitive equality requires a federal definition of 'State bank' to prevent states from disadvantaging national banks visa-vis state-chartered institutions by merely denominating these institutions 'banks' and treating them somewhat differently from state commercial banks, though not so differently as to prevent these institutions from competing with national banks."
>
> We conclude that the Comptroller's use of federal law and the competitive equality standard was legally correct.

*Deposit Guaranty*, 809 F.2d at 270. The court went on to find that the administrative record supported the Comptroller's factual findings that Mississippi savings and loan associations were functioning as banks. *Id.* at 271. Therefore, affording national banks branching powers equivalent to those of the state savings institutions was correct. *Id.*

Following the *Deposit Guaranty* decision, the District Court for the Western District of Texas also reviewed a decision by the Comptroller to permit a national bank to branch to the same extent as state savings and loan associations. *Texas v. Clarke*, 690 F.Supp. 573 (W.D.Tex.1988). In Texas, state commercial banks were permitted by the state constitution to branch

within the county where their principle offices were located whereas, by statute, state savings and loan associations were permitted to branch statewide. The court adopted the same reasoning as the court in *Deposit Guaranty*, approving the Comptroller's decision. *Id.* at 577–79.

Plaintiffs rely upon the case of *Mutschler v. Peoples Nat'l Bank of Wash.*, 607 F.2d 274 (9th Cir.1979). In *Mutschler*, a national bank with its principle offices in Seattle, King County, Washington applied to relocate a branch from Mesa, Franklin County to Basin City which was an unincorporated community in the same county. The relevant Washington statute provided that banks and trust companies were permitted to establish branches in any city or town in the state. The federal court certified a question to the Supreme Court of Washington to determine whether "city or town" as found in the statute included a county's unincorporated areas. The state supreme court determined that the statute was not intended to include such unincorporated areas. Accordingly, since a state bank could not have established a branch in an unincorporated area of the state, the court held that under the McFadden Act, neither could a national bank. The Comptroller made three arguments in support of his decision to approve the branch. The third, and seemingly least relied upon by both the court and the Comptroller, was that a state savings and loan associations would not have been restricted to branching in incorporated cities and towns. The court, unlike those in *Deposit Guaranty* and the *Texas* case, did not conduct a detailed analysis of the functions being performed by state savings institutions. It cited a state court case which had alluded to the blurring of the traditional distinctions between commercial banks and thrifts, but concluded that maintenance of competitive equality counseled against permitting national banks to branch in the same manner as state savings institutions. *Mutschler*, 607 F.2d at 280.

Plaintiffs also cite *Dakota Nat'l Bank & Trust v. First Nat'l Bank*, 554 F.2d 345, 353 (8th Cir.1977), in support of their posi-

tion. In that case, a national bank wished to establish a branch which would not have been permitted to a state bank under North Dakota law. The national bank argued was that the Bank of North Dakota was permitted to establish banks statewide. However, the Bank of North Dakota was unique in that it was a state owned institution designed "[f]or the purpose of encouraging and promoting agriculture, commerce and industry...." *Id.* at 355. The court found that the definition of state bank under § 36(h) of the McFadden Act did not address the issue of whether a state owned bank is a bank operating "under the authority of State laws." *Id.* at 356. The court went on to hold, without expressing any opinion as to whether the state owned bank could in fact branch statewide, that the doctrine of competitive equality applied to privately owned state and national banks but not to an arm of the state such as the Bank of North Dakota.

In his Amicus Brief, the State Comptroller argues that the unambiguous terms of § 36(c) of the McFadden Act requires rejection of the COMPTROLLER's position. (DE 32 at 17–8). The State Comptroller focuses on the language in § 36(c) which states that a national bank may establish and operate branches to the same extent state law permits state banks "by language specifically granting such authority affirmatively and not merely by implication or recognition...." Even if it were to accept the premise that state savings and loans are carrying on banking business, the argument runs, the court should reject the COMPTROLLER's position because the Florida Statutes do not grant statewide branching capabilities affirmatively. Rather, the ability to branch statewide exists by implication.

Section 665.028(1)(a) of the Florida Statutes defines a "branch office" of a savings and loan association as "a legally established place of business of the association, other than the home or corporate office, ... where the business of an association may be conducted." Subsection (1)(c)(1) requires the branch application to state the proposed location of the branch, without placing any limitation on permissible loca-

tions. The courts in *Deposit Guaranty* and *Texas v. Clarke* found statutes less explicit than Florida's sufficient to satisfy § 36(c) of the McFadden Act. This court finds that the court has affirmatively permitted state savings and loan associations to branch statewide by requiring them to specify a proposed branch's location in the application without placing any limitation on prospective locations. Accordingly, the court rejects the State Comptroller's argument.

The court finds none of the cases relied upon by the Plaintiffs damaging to the Defendants' position. In contrast to the courts in *Deposit Guaranty* and *Texas v. Clarke*, those in *Mutschler* and *Dakota National* did not thoroughly analyze the blurring of the functional distinctions between savings and loan associations and commercial banks. Additionally, both cases are factually distinguishable from this case and those relied upon by the Defendants. The reasoning of the fifth circuit and that of the Western District of Texas is sound and persuasive. The court finds the COMPTROLLER's definitions of "banking business" and "state bank" are consistent with the federal policy of competitive equality and represent a reasonable interpretation of the McFadden Act.

3. The Administrative Record

■ The administrative record filed by the COMPTROLLER includes the order granting CONSOLIDATED's request to establish the Palm Beach County mini-branch, CONSOLIDATED's application, requests for comment on the application, correspondence by interested parties and agency memoranda. Having determined that the COMPTROLLER's legal conclusions are correct, the court must consider his factual finding that Florida savings and loan associations are "carrying on the banking business." Such a factual determination by the COMPTROLLER will not be disturbed unless the court finds it arbitrary and capricious. *Deposit Guaranty*, 809 F.2d at 271; *Texas v. Clarke*, 690 F.Supp. at 577–8.

The COMPTROLLER's order cites the many functions which state savings and loan associations are permitted to perform under the Florida Statutes. A state savings and loan association may properly engage in the following activities: (1) acquire savings and pay earnings, Fla.Stat. §§ 665.-0501(18) and 665.066; (2) offer negotiable order of withdrawal (NOW) accounts, Fla. Stat. § 665.067; lend and commit to lend, extend credit, and invest its funds, Fla. Stat. §§ 665.0501(18), 665.0701 and 665.-0711; (3) make personal and consumer loans, Fla.Stat. § 665.0711; (4) sell money orders, traveler's checks and similar instruments, Fla.Stat. § 665.0501(20); (5) own and use remote financial service units (commonly known as automatic teller machines), Fla.Stat. § 665.0501(17); (6) act in a fiduciary capacity for customers, Fla. Stat. § 665.0501(16); (7) service loans and investments, Fla.Stat. § 665.0501(7); (8) maintain and lease safety deposit boxes, Fla.Stat. § 665.0501(19); and, (9) purchase, sell, lease and mortgage both personal and real properties, Fla.Stat. § 665.0501(3). (DE 21, Administrative Record, Comptroller's Order at 10). Additionally, under § 655.061, state savings and loan associations are permitted to exercise any power permissible for a federal savings institution. Therefore, state institutions are permitted to exercise powers given to federal savings and loan association under the Garn–St. Germain Depository Institutions Act, which include the power to: (1) offer demand deposits to businesses that have, at some time, had a loan relationship with the savings and loan, 12 U.S.C. § 1464(b)(1); (2) make commercial loans of up to 10% of assets to commercial customers, 12 U.S.C. § 1464(c)(1)(R); and (3) make investments in tangible personal property of up to 10% assets for purposes of rental or sale, 12 U.S.C. § 1464(c)(2)(A). (DE 21, Administrative Record, Comptroller's Order at 11).

The COMPTROLLER stresses that many of these functions diverge from savings and loan associations' traditional role as providers of savings accounts and home loans. The order refers to advertisements produced by various state thrifts, which notify the public of the many traditional banking services, especially checking accounts, available through them.[3] Interestingly, also included in the administrative record is a report by Centrust Savings Bank[4] in which it states: "Our goal is to transform Centrust into a regional commercial bank providing an array of services to meet the needs of the marketplace." (DE 21 at 58). All of this, the COMPTROLLER argues, is evidence that the state savings and loan associations are not only engaging in banking business but also aggressively competing for the market traditionally reserved for commercial banks. After review of the record as a whole, the court cannot find that the COMPTROLLER's factual determinations are arbitrary and capricious.

## Conclusion

Based upon the analysis above, the court finds that Plaintiffs have failed to show that they are likely to succeed on the merits of their claim. Having made this determination, the court need not consider the remaining elements necessary for issuance of a preliminary injunction.

Accordingly, it is hereby ORDERED and ADJUDGED that the Motion for Preliminary Injunction (DE 4) of the Plaintiffs, BARNETT BANK OF SOUTH FLORIDA, N.A. and BARNETT BANK OF PALM BEACH COUNTY, is DENIED.

DONE and ORDERED.

**3.** *See* the Appendix to CONSOLIDATED's Memorandum in Opposition to the Motion for Preliminary Injunction, DE 16, for a compilation of such advertisements.

**4.** The advertisements compiled in DE 16 indicate that it is common for thrift institutions call themselves savings *banks* rather than savings and loan associations.